UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

JAMES ROY KLUMB )
)
v. )
) No. 2:09-cv-115
CRYSTAL GOAN ) Magistrate Judge Carter
)

MEMORANDUM

I. Introduction

Plaintiff Roy Klumb brought this action alleging defendant Crystal Goan, formerly
his wife, violated the federal Wiretap Act, 18 U.S.C. § 2510 *et seq.*, and the Tennessee
Wiretap Act, Tenn. Code Ann. § 39-13-601 *et seq.,* by installing spyware on his
computers without his consent to intercept his incoming email.  A bench trial was held
and, having heard all the evidence, the Court concludes that defendant Crystal Goan did
violate the two wiretap statutes, that the plaintiff is entitled to the statutory damages of
$10,000, and that defendant's violation of the wiretap acts was part of a larger scheme to
gain advantage of the plaintiff during their divorce thereby warranting punitive damages
in the amount of  $10,000.  The plaintiff is also entitled to reasonable attorney's fees and
costs.  An appropriate judgment shall be entered.

II. Facts

As written, the federal and Tennessee wiretap acts can encompass those situations
where spouses resort to computer espionage as weapons of domestic warfare when their

marriage sours. It is not clear whether Congress and the Tennessee legislature envisioned their respective statutes being used in such a manner, but case law indicates such actions are not uncommon. This case, however, is not a garden variety case of one spouse putting spyware on the other spouse's computer to electronically eavesdrop. Plaintiff alleges defendant engaged in an elaborate, deceptive scheme which involved wiretapping his computer to intercept emails, altering those emails to make it appear he was having an affair, and altering legal documents in order to provide that if plaintiff did have an affair, defendant would receive more money in a divorce. Because of the elaborate nature of the allegations and because the plaintiff seeks punitive damages, the Court has been required to focus a wide lens on the parties' conduct and consider behavior beyond simply wiretapping. The result is the regrettable and unavoidable airing of dirty laundry.

*A. Background*

*1. The Parties' Relationship*

Roy Klumb met Crystal Goan in the summer of 2003, between Crystal's first and second years of law school at the University of Memphis, when she was hired for office work at the Greeneville, Tennessee office of Klumb Lumber Company (KLC). KLC is a third generation family business based in Mississippi, founded by Roy's grandfather, and presently headed by Roy's father. Roy Klumb was overseeing the operation of the KLC Greeneville office, spending about half his time in Greeneville, Tennessee and half his time in Mississippi. Roy, who owns stock in KLC and has a significant interest in a

2

business partnership with his two siblings, is a wealthy man. Roy has a son and a daughter from a previous marriage who lived with their mother in Mississippi.

Roy and Crystal began dating in the summer of 2004 when Crystal, who is from Greeneville, returned home again from law school. Roy and Crystal continued to date when she returned to the University of Memphis for her final year of law school. The relationship appears to have been fraught with concerns of fidelity from the very beginning. Roy was overly possessive, frequently calling Crystal to ask where she was and what she was doing. Crystal, who knew Roy's first marriage had ended, at least in part, due to infidelity, was fearful that his previous dating relationships had not ended. After defendant graduated from law school in May 2005, she returned to Greeneville and began working at a law firm. The parties continued dating. Roy was generous to Crystal with KLC resources. He allowed her to use the computers and fax machine in the KLC office and a company gas card, and company cars.

Unfortunately, plaintiff's and defendant's relationship both before and after their marriage was severely strained. Roy often drank excessively. In one incident in Memphis, prior to Crystal's and Roy's marriage, he drank too much and was thrown out of a restaurant for throwing peanuts at the waitress. That same evening in their hotel room, Crystal ended up with a black eye. On their honeymoon, he drank too much and became verbally abusive. In another incident after their marriage, Roy became so inebriated he passed out in their home and lost control of his bodily functions. Crystal had

3

to call a friend to help clean him up and put him to bed.  Crystal, on the other hand,

worried obsessively about whether Roy was being faithful.

### 2. Execution of the Prenuptial Agreement

In December of 2005, Roy and Crystal became engaged.  Roy discussed a

prenuptial agreement with Crystal.  Most of Roy's assets were in the family business,

KLC, and in the partnership with his siblings, and he wanted to protect those assets in the

event the marriage failed.  He agreed to allow Crystal to draft the prenuptial agreement.

According to Roy, on April 24, 2006, five days before Crystal's and Roy's marriage on

April 29, 2006, defendant came to the KLC office with two copies of a prenuptial

agreement.  They sat at his sales desk in a large, central sales office and reviewed one of

the copies line by line.  He found the agreement satisfactory, initialed each page, and then

signed it.  Defendant then handed him the second copy which he initialed and signed as

well.  Since he believed the second prenuptial agreement to be an exact replica of the first,

he did not read it line by line.  He took the first prenuptial agreement, and, when he

returned to the KLC office in Mississippi, he stored it in a lock box.  Crystal took the

second copy, which Roy had not read, to another office to be notarized.

Crystal, on the other hand, testified that she and Roy walked together to the office

of a Greeneville attorney, Ron Chestnut, where Janine Pryor notarized the prenuptial

agreement.  Ms. Pryor testified at trial that Roy and Crystal came to her office on April 24,

2006 where they signed a prenuptial agreement and she notarized it.  Ms. Pryor did not

have any record of this event, which took place over five years ago, because she does not

4

keep a log of the documents she notarizes. She testified she notarizes over 200 documents a year. Plaintiff testified he had been to Ron Chestnut's office before, but he was not there on April 24, 2006.

For reasons that will become clear during the course of this opinion, the Court credits the plaintiff's testimony concerning the prenuptial agreement. In this regard, the Court finds that Ms. Pryor is too far removed from the incident, more than five years, and notarizes too many documents each year, more than 200, to be a reliable witness on this matter. Moreover, the Court notes that during Ms. Pryor's testimony she appeared extremely nervous and unsure of her testimony. The Court does not credit her testimony.

### 3. Spectorsoft and eBlaster

Before Roy and Crystal were even married, Crystal purchased spyware from a company called Spectorsoft. Spectorsoft records unequivocally establish that, on March 21, 2006, before Crystal and Roy were married, Crystal Goan purchased Spectorsoft's spyware called eBlaster with her credit card and had a CD of the software sent to her law offices in Greeneville, Tennessee.

eBlaster is a computer software program that can perform various spyware functions. It can record every keystroke made on the computer on which it is installed. It can also keep track of all websites visited and all applications used on that computer, and

5

it can capture screenshots of instant messages and cached webpages.[1]  In addition, it can be directed to compile a report of this information at selected time intervals and send that report to a designated third party email address.  Further, it can be directed to automatically forward copies of incoming email accessed on that computer to the third party email address. Each individual email is sent separately and independently from the eBlaster reports.  eBlaster can also forward to this third-party email address copies of instant messages or "chat" messages as they are occurring.  Even with an anti-virus program, eBlaster generally cannot be detected on the computer on which it is installed unless a person knows the "hot key" combination, the three key combination which must be depressed simultaneously in order to make eBlaster's dialog box appear on the computer screen.  Once the dialog box appears on the screen, a username and password is required in order to go to the eBlaster control panel.  At the control panel, the user chooses the settings for eBlaster to provide the desired information.

  After she and Roy were married, Crystal surreptitiously installed eBlaster on June 12, 2006, at 8:29 pm on a computer owned by KLC that was commonly referred to as Roy's sales desk Dell computer (the Dell computer) in the KLC Greeneville office.   The Dell computer was the computer that Roy most commonly used, and his children used this

---

[1]When a person accesses the internet on a computer, portions of the web pages that are being viewed are "cached" to the computer's hard drive.  eBlaster can recover these cached web pages.  (*See* William Dean trial testimony, Page ID # 787.)

computer on the few occasions they visited from Mississippi. Crystal frequently used the Dell computer.

In May or June of 2007, KLC replaced and upgraded the Dell computer with an HP Vista computer (the Vista computer). Roy then used the Vista computer at his sales desk in the sales office as his primary computer. Roy's children and Crystal were also allowed to use this computer. Spectorsoft records unequivocally establish that, on June 27, 2007, Crystal purchased a second eBlaster software package. She surreptitiously installed it on the Vista computer on Roy's sales desk that same day.

### *4. The Computers and Printers in the KLC Office*

The KLC office in Greeneville had a large, central sales office furnished with at least six desks, each having its own computer. The sales office was a large open area, and each person in the sales office could see everyone else's desk. The Dell computer, and later the Vista computer, were located on Roy's sales desk in this main sales office. Another, smaller office was attached to the large sales office. This smaller office belonged to Andrea Hill, office administrator for KLC in Greeneville. All the computers in the sales office were networked to an administrative computer in Hill's office. To access her computer, Hill had to enter her username and password. If Hill's computer was logged on, then the computers in the sales office were accessible as well without the need to enter a username or password. If Hill's computer was shut down, then the computers in the sales office each could be accessed with a username and password specific to that individual computer. The computers were networked to allow all the sales agents for KLC

7

to use a special inventory and invoicing program designed specifically for lumber companies. Hill's computer was never shut down, except for maintenance, because KLC salespersons who travelled around the region needed to be able to come in at odd times to enter a sales order into the inventory and invoicing program. There were no printers in the large sales office. There were two printers in Hill's office which were routed through her administrative computer. In order to print something from one of the sales office computers, Hill's computer had to be logged on; if Hill's computer was not logged on, then anything sent to the printers in her office would queue up and not print out until the next time Hill logged onto her computer. Finally, access to the KLC computer system did not give one access to another person's personal email account. Even if Hill's computer was logged on or someone had properly logged into one of the sales desk computers, one could not access another individual's personal email account without that person's email account username and password.[2]

### 5. Initiation of Divorce Proceedings

During the course of the parties' marriage, plaintiff's children each visited about a total of two weeks until, in February 2007, plaintiff's son came to live with plaintiff and the defendant. Under the pressures of a blended family, Roy's continued drinking, and Crystal's suspicions about Roy's fidelity, the marriage continued to deteriorate. Crystal

---

[2] KLC also had its own company email domain and each employee had an account in that domain. The interception of emails sent to the KLC domain are not at issue in this case.

8

learned on or about August 27, 2007, that Roy had had dinner with a female friend during a trip to Mississippi. When confronted about it, Roy lied and denied having seen this friend. For her part, Crystal was engaged in an affair with attorney Todd Shelton who testified at trial that he had had an intimate relationship with Crystal beginning in the fall of 2007 and continuing into 2008. On September 7, 8, and 9, 2007, Crystal and Shelton stayed together at the Grove Park Inn in Asheville, North Carolina while Roy was on a business trip.[3] On September 21, 2007, Crystal had Roy served with divorce papers and a temporary restraining order forcing Roy out of the home.

### 6. Reconciliation Attempts

The following week, on the evening of September 26, 2007, the couple talked**.** Crystal told Roy that if he would go to alcohol rehabilitation, she would give their marriage another try. They discussed the conditions under which such an attempt would take place and decided to memorialize their agreement in an agreed order which they would submit to the court in their divorce case. The next day, on September 27, 2007, Crystal met Roy at the Greeneville KLC office with the agreed order she had drafted.

---

[3] In a letter dated September 18, 2007, Crystal wrote Shelton and one Janie Lindamood to address allegations by one Mr. Davis that she was having an affair with his (Davis') attorney, Todd Shelton, in the divorce case of *Davis v. Davis*. Crystal denied such an affair as a "rumor typical of a small town divorce" and stated her intent to continue as "Guardian." Based on this reference to herself as guardian, the Court surmises Crystal had been appointed guardian for the minor children involved in the case. Joint Ex. 77. The Court references this letter only because it has bearing on Crystal's veracity, not because it has any bearing on the substantive issues raised in this action.

They reviewed it and signed it. At trial, Todd Shelton testified that on September 27, 2007, Crystal gave him a sealed manila envelope and asked him to take it to Judge Wright, the state court judge assigned to the Klumb divorce case, for Judge Wright's signature. Shelton took the envelope to Judge Wright who opened it and signed it. It was an agreed order signed by plaintiff and defendant in the Klumb divorce case.

### *7. Events While Plaintiff was in Rehabilitation*

On September 29, 2007, plaintiff and defendant left Greeneville to drive to Ft. Lauderdale, Florida where plaintiff enrolled in a recovery program for alcohol addiction, and defendant returned to Greeneville. Roy had given his car keys, with keys to the KLC office on the key chain, to Crystal so that she could use his vehicle while he was away. While he was gone, defendant sent cards to plaintiff indicating she wished for his "safe and sober" return. She asked him to be home for her birthday on October 31, 2007.

One evening, while Roy was still at the recovery center in Florida, KLC truck driver Roger Colyer came into the KLC office at 3 or 4 am, as was his normal practice, to clock in and prepare his load for delivery. He saw Crystal in the sales office using one of the computers. Later that morning, Colyer called Andrea Hill to tell her what he had seen. At trial, Hill confirmed that one morning when Roy was at the recovery center, Colyer called her to tell her that he had seen Crystal in the sales office using one of the computers at 3 or 4 am. In response to Colyer's information, Hill shut down her administrative computer that evening, contrary to her previous practice. In doing so, she also shut down the printers in her office. The following morning when she returned to the office and

10

logged into her administrative computer, one of the printers printed an email sent to plaintiff by a woman the Court shall refer to simply as "R.G." The heading of the email was as follows:

> 28 Sep 2007 07:29:30-0400
> From : "rg…@..."[4] <noreply@spectorsoft.com>
>        Alert
> To:cmgoan@yahoo.com
> Subject:       [0060-rcv-eblaster] Re: letter

Jt. Ex. 17. The email was addressed "Dear Roy" and was closed, "Always," followed by R.G.'s first name. (Jt. Ex. 17.) Hill put the two page email in a folder to give to Roy when he returned from the recovery center.

Travis Reno was employed as a salesman at KLC during all times relevant to this lawsuit. He testified that he had once helped Crystal use a USB key on one of the KLC computers to retrieve a legal document and that he had seen her use a USB key on other occasions as well.[5] He further testified that Crystal came in regularly during the day for ten or fifteen minutes to check her email. One day, while Roy was still at the recovery center in Florida and Reno was sitting at a desk next to Crystal, he noticed multiple lines

_____

[4] The Court has redacted the remaining portion of this email address.

[5] A USB key is a small, portable computer drive. It is also sometimes referred to as a thumb drive, a jump drive, a flash drive, or a portable drive. It will plug into a computer and allow a person to download files from the computer to the USB key. One can also transfer files from a USB key to a computer.

11

in her email inbox containing Roy's name and "eBlaster" next to it.  He could also see that her email address was cmgoan@yahoo.com.

### 8. Plaintiff's Return to Greeneville

On October 27, 2007, plaintiff arrived home from the recovery center.  To his surprise, his wife did not receive him warmly.  On October 29, 2007, plaintiff returned to work for the first time since going to rehabilitation.   At that time, Andrea Hill gave him the email she had placed in the folder for safe keeping and told him that Roger Colyer had seen Crystal in the office using the Vista computer at 3 or 4 am when he was at the recovery center.  Travis Reno also told plaintiff what he had seen on Crystal's email account, explained to him that eBlaster was spyware, and showed him the eBlaster program on the internet.  Reno testified that plaintiff was "in shock" and that plaintiff unplugged the Vista computer.

On October 30, 2007, defendant's attorney, Jerrold Becker, sent a letter to plaintiff's attorney, Kidwell King, advising Mr. King that defendant wanted plaintiff to leave the house.  (Jt. Ex. 78.)  On October 31, 2007, plaintiff moved to the Hampton Inn in Greeneville.

### 9. The Agreed Order

In his October 30, 2007 letter,  Mr. Becker, Crystal's attorney, attached an agreed order signed by Roy and Crystal dated September 27, 2007.  Paragraph 5 on the third page of this agreed order mentioned an amendment to the prenuptial

12

agreement and provided, *inter alia*, that if either party was unfaithful, the

prenuptial agreement would be deemed null and void, all assets acquired before the

marriage would be treated as marital assets, and the injured party would receive

three fourths of the marital assets in the divorce. (Jt. Ex. 3. ¶ 5). This agreed

order was signed on the last page by the parties and by Hawkins County Circuit

Court Judge Tom Wright. None of the individual pages were numbered or

initialed.

Within a few days after returning from the recovery center, Roy met with Mr. King

and saw this agreed order attached to Mr. Becker's letter. Plaintiff testified that when he

saw paragraph 5 of the agreed order he was shocked because he was certain that the

agreed order he had reviewed with Crystal and signed on September 27, 2007 did not have

this language. According to Roy, there was never an amendment to the original prenuptial

agreement and he never would have agreed to make the prenuptial agreement null and

void for any reason; nor would he have agreed to make his KLC and partnership assets

part of the marital property since his entire purpose in having the prenuptial agreement

was to protect those assets for his children.

### *10. The Recorded Phone Conversations*

On November 6, 2007, plaintiff's attorney received a letter by fax from

defendant's divorce attorney. The letter included a copy of the prenuptial agreement dated

April 24, 2006. Roy left for Gulfport, Mississippi that same day to retrieve his copy of the

prenuptial agreement that he had stored in a lockbox. While he was driving to Mississippi

13

to retrieve his copy of the prenuptial agreement, Crystal phoned. Crystal recorded this conversation which was introduced as an exhibit at trial, both in audio and in transcript form. In the conversation, Roy told her that certain employees thought she had installed eBlaster on the computers at the office. Crystal asked, "What is eBlaster ?" (Jt. Ex. 5 at p. 6). She also told Roy she would "set this s**t" straight" with the person who accused her of putting eBlaster on his computer. (*Id.* at 9). Crystal told plaintiff she had always been faithful to him and never lied to him. (*Id.* at 2). She denied having been at the KLC office at night during the time he had been at the recovery center. (*Id.* at 7). She told plaintiff that she had read the September 27, 2007 agreed order to him, including the paragraph which rendered the prenuptial agreement null and void in the event of infidelity, and that she had explained it to him and answered his questions about it. (*Id.* at 2.) Roy disputed these assertions. Crystal also asked Roy if he did not remember signing a new amended prenuptial agreement to give her further protection if he cheated on her. He stated, "I remember …" (*Id.* at 8).

Roy and Crystal had another phone conversation the morning of November 8, 2007 which Crystal also recorded and which was also made an exhibit at the trial in audio and transcript form. Again, Roy told Crystal that some of the employees at KLC were suspicious she had installed eBlaster on a KLC computer at the office. Sounding incensed, Crystal responded, "Number One, I don't have to have f***ing eBlaster. They're on my server. I learned the hard way. Anything they have, do, I have access to. I can call up my own IT guy—tap it in—because my name is Klumb. I don't need f***ing

14

eBlaster." (Jt. Ex. 5 at pp. 14 -15). The Court interprets Crystal's response to Roy's inquiries about eBlaster in both the November 6 and November 8, 2007 conversations as unequivocal denials that she put eBlaster on any computer at KLC.

### 11. The Two Prenuptial Agreements

On or about November 14, 2007, after Roy had retrieved his signed prenuptial agreement and returned to Greeneville, he met with his attorney, Mr. King, to compare the prenuptial agreement attached to the letter of Mr. Becker, Crystal's attorney, to the prenuptial agreement Roy had stored in the lockbox. Both were signed and dated by Crystal and Roy.

Section VI of the prenuptial agreement attached to Mr. Becker's letter stated in relevant part:

> The parties also stipulate and agree that if either of the two individuals allege and [sic] can be proven in front of a judge, and the burden of proof being CLEAR AND CONVINCING EVIDENCE, that the other individual has committed adulterous activity during the marriage, (referred to as "committing spouse"), then all marital assets shall be divided as a three-quarters (3/4) split, ***and the complete document will be rendered null and void,*** the non-committing spouse retaining the larger portion and the spouse proven of committing adultery shall retain one quarter (1/4) of the marital assets.

(Jt. Ex. 34) (emphasis added). Section VI of the prenuptial agreement plaintiff retrieved from his lock box provided

> The parties also stipulate and agree that if either of the two individuals allege and [sic] can be proven in front of a judge, and the burden of proof being CLEAR AND CONVINCING EVIDENCE, that the other individual has committed adulterous activity during the marriage,

15

> (referred to as "committing spouse"), then all marital assets shall be
> divided as a three-quarters (3/4) split, ***and at the complete exclusion of
> separate property herein listed as of the date of signing in Exhibit A,*** the
> non-committing spouse retaining the larger portion and the spouse proven
> of committing adultery shall retain one quarter (1/4) of the marital assets.

(Jt. Ex. 6) (emphasis added). The same exhibit was attached to both prenuptial

agreements listing those items of plaintiff's property which were not to be considered part

of the marital property. In this list, plaintiff explicitly designated all his assets, interest

and stocks in KLC and in the partnership with his siblings which were acquired before the

marriage as exempt from the marital property. At trial, Plaintiff testified that the "null and

void" language found in the prenuptial agreement attached to Mr. Becker's letter was not

included in the prenuptial agreement that he and defendant had read line by line and

signed five days before their marriage.

### 12. KLC's Attempts to Uncover eBlaster

About the same time Roy compared the language of the two prenuptial

agreements, he received an anonymous text message that Crystal was having an affair

with Todd Shelton. He hired a private investigator to look into that matter and left the

issue of eBlaster on the KLC computers to the KLC company lawyers who attempted,

without success, to determine from defendant's attorney whether defendant had installed

eBlaster on one or more KLC computers. The KLC company lawyers eventually sent a

subpoena to Spectorsoft for information. In the meantime, the divorce case slowly moved

forward. Crystal's deposition in the divorce proceeding was taken on two days, March 13,

2008 and April 7, 2008. Plaintiff sent defendant a subpoena asking defendant to produce,

16

*inter alia*, all documents which defendant believed supported her allegation that plaintiff had had an affair during their marriage and all documents obtained through the eBlaster software.  Pursuant to a subpoena duces tecum, defendant produced a stack of documents a couple of inches thick containing eBlaster reports of Roy's computer activities on the Dell and Vista computers and copies of emails sent to Roy at his AOL email address which were intercepted by eBlaster and sent to Crystal at cmgoan@yahoo.com.

*B. Forensic Examination of the KLC Computers and Crystal's Laptop*

*1. Discovering eBlaster*

After a KLC information technology employee could not locate eBlaster on any of the KLC computers in Greeneville,  Roy independently hired William Dean, a forensic computer expert, to examine several of the computers which were or had been located in the KLC sales office in Greeneville.  Dean began his examination of the KLC computers in April 2008.  Working with Spectorsoft technicians after KLC convinced Spectorsoft that KLC owned the computers in question, Dean obtained the "hot key" combination and the password for the eBlaster programs Crystal had bought, enabling him to reveal the eBlaster control panel on both the old Dell and the Vista computers.  Dean did not find eBlaster software on any other computer.  The password for the eBlaster program was cmgoan369.  Using data recovery software, Dean also examined the hard drives of the Dell and Vista computers and two other computers which had been located in the KLC sales office.  After sending a discovery request in Spring 2008, defendant was finally able to obtain Crystal's Gateway laptop in October 2008, and Dean also examined this laptop.

17

Dean's examination of the Dell and Vista computers showed that when Crystal installed eBlaster on them, she set up the program to send a report of all computer activities to her email address at cmgoan@yahoo.com every hour. She also directed that a copy of every email sent to Roy Klumb at his personal AOL email account and accessed from the Dell or Vista computers would be sent automatically to her email address of cmgoan@yahoo.com. Roy had not given Crystal a copy of his email password, but she was able to obtain it because the keylogging function of eBlaster recorded it when Roy logged in to get his email. At the trial, Roy testified he knew Crystal had an email address at aol.com but he was not aware of her Yahoo email account. Crystal also set up folders in her Yahoo email account to organize the emails she received. She named one of these folders "infedility" [sic]. Thereafter, she received hourly reports at cmgoan@yahoo.com of all internet activity on the Dell and Vista computers, as well as copies of all emails and instant messages sent to Roy that he accessed from the Dell or Vista computers. (*See* Trial Exhibit 87.[6]) It is these reports and copies of emails that defendant provided at her March 13, 2007 deposition pursuant to the subpoena duces tecum.

---

[6] Trial Ex. 87 is comprised of the forensic reports prepared by expert witness William Dean. The method by which exhibits were presented at trial was less than ideal. For some reason, Trial Exhibit 87 was split into two separate notebooks. One notebook, referred to as "Volume 2" has only a small portion of Trial Ex. 87 in addition to many other exhibits. Another notebook is comprised only of the remaining portions of Trial Ex. 87. *See* Dean Testimony, Page ID # 805. Unless otherwise indicated, all references to Trial Ex. 87 are to the notebook which only contains the bulk of Trial Ex. 87.

*2. USB Key*

As previously indicated, Dean examined the hard drives of four KLC sales office computers and defendant's Gateway laptop computer. In doing so, Dean found evidence that someone had opened three documents entitled E-Mail 1, E-Mail 2, and E-Mail 3 from a USB key on one of the KLC computers on October 14, 2007, a date when plaintiff was in Florida at the recovery center. Dean also found evidence that the serial number of this USB key matched the serial number of a USB key which had been used on Crystal's Gateway laptop as recently as May 7, 2008. At trial, Crystal testified she had not had a USB key since her first laptop and that USB key had been destroyed by an electrical surge caused by lightning on September 3, 2007. Crystal further testified that she could not have used a USB key on her laptop on May 7, 2008, because she had given her laptop to her divorce attorney when plaintiff had requested it in discovery. There was no testimony or corroborating evidence to support Crystal's testimony in this regard, and the forensic evidence is contradictory; the Court does not credit her testimony.

*3. The September 25, 26, and 28, 2007 Emails*

Dean's examination of the materials provided by defendant pursuant to the subpoena duces tecum revealed that there are at least three different versions each of three emails: one dated September 25, 2007, one dated September 26, 2007, and one dated September 28, 2007.

*a. The September 25, 2007 Email*

One version of the September 25, 2007 email, an email between Roy and a woman referred to herein as R.G., has the following heading:

**YAHOO!** MAIL

| | |
|---|---|
| Date: | 25 Sep 2007  13:48:32-0400 |
| From: | rg…@.............[7] <noreply@spectorsoft.com> |
| To: | cmgoan@yahoo.com |
| Subject: | [0022-rcv-eBlaster] RE: (no subject) |

(Jt. Ex. 7, hereinafter referred to as "Version 1 of the Sept. 25, 2007 email").  The salutation of this email is simply "Roy" and R.G. has closed the email with her first name. In the email, R.G., a nurse, offers to help Roy find a rehabilitation clinic and expresses her sadness at Roy's pending divorce.  While the email expresses friendship, it is not indicative of an extramarital affair.  According to Mr. Dean,  pursuant to the settings defendant instituted when she installed eBlaster on the Vista computer, the eBlaster program automatically routed a copy of this email to defendant's Yahoo email account and assigned it the sequencing number "0022-rcv-eBlaster" when Roy retrieved his AOL email using the Vista computer.

There is also another copy of the September 25, 2007 email from R.G. to Roy in the material provided by defendant pursuant to the subpoena duces tecum.  This email is

---

[7] The Court has redacted the remaining portion of this email address.

nearly identical to the other September 25, 2007 email, including "<noreply@spectorsoft.com>" and sequencing number 0022-rcv-eBlaster in the heading. There are two significant differences, however: first, the "YAHOO! MAIL" moniker is missing from the top of this version of the email, and second, there is additional language in the body of the email from R.G. to Roy Klumb which suggests they were having an extramarital affair. (Jt. Ex. 8, hereinafter referred to as "Version 2 of the Sept. 25, 2007 email"). At trial, plaintiff testified this additional language was not in the September 25, 2007 email he received from R.G.

Using data recovery software, Dean found another copy of the September 25, 2007 email on the Vista hard drive. This particular version has no indicia of eBlaster, and Dean opined it is a copy of the original email sent from R.G. to Roy on September 25, 2007. At the very top of the email is "Deleted Message0066" indicating that the email had previously been deleted. (Jt. Ex. 87, Tab A, Deleted Message 0066, herein after referred to as "Version 3 of the Sept. 25, 2007 email"). The body of this email is exactly the same as the body of Version 1 of the Sept. 25, 2007 email – the additional language found in Version 2 of the Sept. 25, 2007 email suggestive of an extramarital affair is missing.

### b. The September 26, 2007 Email

Like the September 25, 2007 email, there are three versions of a September 26, 2007 email from R.G. to Roy, and the patterns which apply to the September 25, 2007 email also apply to the September 26, 2007 email. The heading of the first version is as follows:

21

**YAHOO!** MAIL

Date: 26 Sep 2007 15:08:33-0400
From:          rg…@............. <noreply@spectorsoft.com>
To:            cmgoan@yahoo.com
Subject:       [0037-rcv-eBlaster] RE: letter

(Jt. Ex. 12, hereinafter referred to as "Version 1 of the Sept. 26, 2007 email").  The

salutation of the email is "Dear Roy" and is closed, again, with R.G.'s first name.  The

subject of the email is rehabilitation clinics.  There is nothing in this email indicative of an

extramarital affair.  Based on this document, Dean opined that the eBlaster program

automatically routed a copy of Version 1 of the Sept. 26, 2007 email from R.G. to Roy to

cmgoan@yahoo.com and assigned it the sequencing number "0037-rcv-eBlaster" when

Roy opened his AOL email using the Vista computer.

        There is a second copy of the September 26, 2007 email from R.G. to Roy in the

material provided by defendant pursuant to the subpoena duces tecum.  This email is

nearly identical to Version 1 of the Sept. 26, 2007 email including the date and time and

"<noreply@spectorsoft.com>" and sequencing number 0037-rcv-eBlaster in the heading.

There are two differences: first, the "YAHOO! MAIL" moniker is missing from the top of

the email, and, second, there is additional language in the body of the email from R.G. to

Roy Klumb.  (Jt. Ex. 13, hereinafter referred to as "Version 2 of the Sept. 26, 2007

email").   At trial, plaintiff testified this additional language was not in the September 26,

2007 email he received from R.G.

The third version of the September 26, 2007 email from R.G. to Roy Klumb was recovered by William Dean from the hard drive of the Vista computer. At the top of the email is "Deleted Message 0067." (Jt. Ex. 87, Tab A, Deleted Message 0067, hereinafter referred to as "Version 3 of the Sept. 26, 2007 email.") This particular version has no indicia of eBlaster, and Mr. Dean opined it is a copy of the original email sent from R.G. to Roy on September 26, 2007. And again, the body of Version 3 of the Sept. 26, 2007 email is the same as the body of Version 1 of the Sept. 26, 2007 email – *i.e.*, the language found in Version 2 of the Sept. 26, 2007 email suggesting Roy and R.G. were involved in an affair is missing.

<u>c. The September 28, 2007 Email</u>

The heading of the first version of the September 28, 2007 email is as follows:

**YAHOO!** MAIL

Date: 28 Sep 2007 07:29:30-0400
From:        rg…@............. <noreply@spectorsoft.com>
To:          cmgoan@yahoo.com
Subject:     [0060-rcv-eBlaster] RE: letter

(Jt. Ex. 14, hereinafter referred to as "Version 1 of the Sept. 28, 2007 email"). The salutation of the email is " Dear Roy" and the closing is, "Always," followed by R.G.'s first name. In this email, R.G. provides more information to Roy about rehabilitation clinics and offers her encouragement and support in going to rehabilitation. There is nothing in the email indicative of an extramarital affair. Dean again opined that the eBlaster program automatically routed a copy of Version 1 of the Sept. 28, 2007 email to

23

cmgoan@yahoo.com and assigned it the sequencing number "0060-rcv-eBlaster" when Roy opened his AOL email using the Vista computer.

There is a second copy of the September 28, 2007 email from R.G. to Roy in the material provided by defendant pursuant to the subpoena duces tecum.  This email is the same as Version 1 of the Sept. 28, 2007 email including the date and time and "<noreply@spectorsoft.com>"  and sequencing number 0060-rcv-eBlaster in the heading -- with two significant exceptions:  first, the "YAHOO! MAIL" moniker is missing from the top of the email, and second, there is additional language in the body of the email from R.G. to Roy Klumb which suggests they were having an extramarital affair.  (Jt. Ex. 17, hereinafter referred to as Version 2 of the Sept. 28, 2007 email).  At trial, plaintiff testified this additional language was not in the September 28, 2007 email he received from R.G.  This Version 2 of the Sept. 28, 2007 email is the email Andrea Hill found in the printer the morning after she had shut down her computer (and thus the printer) for the night because KLC truck driver Roger Colyer told her he had seen Crystal in the office on one of the computers the previous night at 3 or 4 am.  When Andrea came in the next morning and logged into her administrative computer, the printer printed out Version 2 of the Sept. 28, 2007 email – an indication that someone had tried to send it to the printer during the night while the administrative computer and the printer were shut down.

The third version of the September 28, 2007 email from R.G. to Roy Klumb was recovered by William Dean from the hard drive of the Vista computer.  At the top of the

24

email is "Deleted Message 0065." (Jt. Ex. 87, Tab A, Deleted Message 0065, hereinafter referred to as "Version 3 of the Sept. 28, 2007 email.")  This particular version has no indicia of eBlaster, and, again, Dean opined it is a copy of the original email sent from R.G. to Roy on September 28, 2007.  The body of Version 3 of the Sept. 28, 2007 email is the same as the body of Version 1 of the September 28, 2007 email – *i.e.*, the language found in Version 2 of the Sept. 28, 2007 email suggesting Roy and R.G. were involved in an affair is missing.

There is also a fourth version of the September 28, 2007 email.  It is similar to Version 2 of the Sept. 28, 2007 email:  it lacks the "Yahoo! Mail" moniker but contains the same date and time, the  "<noreply@spectorsoft.com>"  language, the sequencing number "0060-rcv-eBlaster," and the word "Alert" in the heading.  It also contains the same additional language found in Version 2 which is suggestive of Roy and R.G. having an affair.  (Jt. Ex. 15, Version 4 of the Sept. 28, 2007 email).  It differs from Version 2 of the September 28, 2007 email only in that the heading is spaced slightly differently, perhaps an indication that the email was not printed from one of the KLC computers.  As to the suggestive language in the body of the email, plaintiff testified this additional language was not in the September 28, 2007 email he received from R.G.

### d. The Court's Conclusion Concerning the Emails

At trial, defendant offered no explanation for the differences in content of the various versions of the three September 2007 emails.  Based on the forensic evidence concerning the three emails and the USB key and based on Hill's and Colyer's testimony

indicating defendant was in the KLC office in the wee hours of the morning while plaintiff

was at the recovery center, the Court concludes defendant intercepted the emails from

R.G. to Roy and added the extra language to the emails to make it appear R.G. and Roy

were having an affair.  Dean testified at trial that an email cannot be altered unless the

recipient goes to "reply" mode when, at that point, alterations can be made to the sender's

email.  The Court concludes R.G.'s emails to Roy were intercepted by eBlaster and sent to

Crystal at cmgoan@yahoo.com.  After hitting the "reply" option to each of these emails

sent to Crystal via eBlaster, Crystal then added the incriminating language to the emails.

Crystal then used the "cut and paste" function to copy the email string of each email,

leaving out her "reply" (and thereby also leaving out the "YAHOO! MAIL" moniker at

the top) and pasting it into a separate document which could then be printed out as

"evidence" of Roy's alleged affair with R.G.

### 4. The September 27, 2007 Agreed Order

Using a data recovery program, Dean recovered four temporary files on

defendant's Gateway laptop computer which appear to be slightly different versions of the

September 27, 2007 agreed order.  The language in all four of the documents was the

same except for paragraph 5.  Two of the files had the following language in paragraph 5:

> The parties hereby stipulate, consent, and agree, that this Order in no way
> effects [sic] the previous Order entered into by this honorable Court, and
> that the Wife shall retain sole possession of the Tennessee marital
> residence, pending the outcome of this litigation;

(Jt. Exhibits 59 and 60, ¶ 5).

26

The other two documents had in their respective paragraph 5 the same language found in paragraph 5 of the agreed order which had been signed and entered in plaintiff's and defendant's divorce case by Judge Wright on September 27, 2007. That language was:

> That husband hereby admits and stipulates that an Amendment to the Original Prenuptial Agreement does exist, and was properly executed in January of 2007, with proper consideration given, as to the change in circumstances warranted such an Amendment and husband now has in his sole possession the original of the same and that such agreement states as follows:
>
> a. That upon a finding of infidelity of either such party, the Prenuptial Agreement shall be deemed null and void, and all assets of both parties, individually owned or otherwise, whether acquired during or prior to the marriage, shall be considered marital property;
> b. That upon the finding of infidelity, that the marital property shall be divided accordingly, with the spouse committing the adultery receiving only a quarter (1/4) share of same, and the non-committing spouse receiving three fourths, (3/4's) of the marital property; and
> c. That the finding of such infidelity shall be determined the standards as set forth in the original Prenuptial Agreement.

(Jt. Exhibits 57 and 58, ¶ 5).

At trial, Dean explained why he found four temporary files of the September 27, 2007 agreed order between plaintiff and defendant on the defendant's Gateway laptop:

> These documents were retrieved from print streams on the computer. So when you print a document, it wraps a copy to the hard drive and then sends it to the printer. My opinion is that there were two different copies of this document printed…

(Dean Testimony, Page ID # 854). Dean opined these two versions of the September 27, 2007 Agreed Order could have been printed from the defendant's Gateway laptop

27

computer by inserting a USB key that contained the files into the computer and printing

from the USB key.

Dean was also able to recover from the defendant's Gateway laptop computer a

*saved*, as opposed to *temporary*, file which was also the September 27, 2007 Agreed

Order. This saved file included the suspect paragraph 5 of the September 27, 2007 Agreed

Order signed by Judge Wright. Dean's forensic examination of defendant's Gateway

laptop computer and the metadata in this file indicated the file was created on September

26, 2007 at 10:18 pm, and the file was last saved on September 27, 2007 at 8:50 pm, but it

was not *saved to the hard drive* of the defendant's Gateway laptop computer until October

25, 2007. (*See* Dean Report, Jt. Ex. 87, Tab E2, section entitled "Laptop Used by Crystal

Goan," p. 3.) Dean opined that this particular file was created and modified on a computer

other than defendant's Gateway laptop and was not saved to defendant's Gateway laptop

computer until October 25, 2007, *id.*, – a date when plaintiff was still in Florida in

rehabilitation and could not have put that file on defendant's laptop computer.

### 5. The September 27, 2007 eBlaster Activity Report

One of the documents given to plaintiff by defendant pursuant to the subpoena

during the divorce proceedings was a report prepared by eBlaster for activity conducted on

the Vista computer on September 27, 2007 between 9:34 am and 10:34 am. (Jt. Ex. 1

PLA 00164). The report is recorded from the keylogging function of eBlaster and shows a

letter that Roy typed in Microsoft Word to Crystal. This letter references the conversation

he and defendant had had the night before and states, "for the record, the following was

28

agreed upon….." The rest of the letter is a list of terms which plaintiff states they discussed. For example, plaintiff agreed to go to rehabilitation for alcohol addiction and he agreed to pay some of defendant's bills. It closes with the statement, "Agreed upon September 27, 2007" followed by a signature line each for plaintiff and defendant. There is *nothing* in this document which references the parties' prenuptial agreement, infidelity, or treating premarital assets as marital assets upon the finding of infidelity.

Plaintiff testified that the morning after he and defendant met at the Hampton Inn on September 26, 2007, to discuss how they might save their marriage, he sat at the Vista computer and wrote down his understanding of their discussion. When Crystal came in later that morning with an agreed order which he thought reflected what they had discussed the night before, he signed her agreed order and did not use the document he had prepared. Plaintiff's testimony is consistent with the forensic and documentary evidence. The letter plaintiff drafted to defendant the morning after they discussed drawing an agreed order contains none of the language in the suspect paragraph five. And because the copy of the letter plaintiff drafted to defendant on September 27, 2007 came from eBlaster, the date and time it was written are confirmed by the eBlaster report – the letter is not something plaintiff could cook up later to support his claims. Further, if plaintiff and defendant had been emailing back and forth different language to put in their agreed order, the emails from Crystal to Roy would have been intercepted by eBlaster and sent to defendant at her Yahoo email account. No such emails were produced to support defendant's position.

The Court also notes that, at trial, defendant did not take the position that the agreed order with the suspect paragraph 5 and Judge Wright's signature was the correct agreed order.  Rather, defendant testified at trial it was plaintiff who had printed the agreed order for them to sign and plaintiff had mistakenly printed out the wrong one, the one with the suspect paragraph 5, a result of their emailing back and forth different versions of the agreed order. (Crystal Goan trial testimony, Page ID # 1558-59).  The aforementioned forensic evidence contradicts this testimony:  *defendant* printed out both versions of the agreed order, and *defendant* saved the agreed order with the suspect paragraph 5 on her laptop computer while plaintiff was at rehabilitation.  Moreover, the Court notes that, contrary to her trial testimony, during her November 6, 2008 phone conversation with plaintiff, defendant insisted to plaintiff that they had discussed and he had agreed to the language in the now suspect paragraph 5, a position plaintiff disputed both during the phone conversation and at trial.  Finally, the Court is cognizant of the fact that plaintiff did state during the November 6, 2007 phone conversation that he remembered an amendment to the original prenuptial agreement.   The Court does not know if plaintiff was simply trying to placate his very angry wife or whether there really was an amendment to the prenuptial agreement.  Either way, given the aforementioned evidence, the Court is convinced that the parties had not agreed to the language in the suspect paragraph 5 and that the agreed order which plaintiff actually signed on September 27, 2007 did not contain the suspect paragraph 5.  The Court concludes that after plaintiff and defendant signed the September 27, 2007 agreed order, none of whose pages were numbered or initialed by the parties, defendant substituted one or more pages of the agreed

30

order with new pages which included the suspect paragraph 5.  Defendant then enclosed

the agreed order in a sealed manila envelope and gave it to Todd Shelton.  In turn, Shelton

took it to Judge Wright who signed it and entered it into the *Klumb v. Klumb* divorce case.

### III. Discussion

#### A. Is the Statute of Limitations a Bar to Plaintiff's Claims?

The statute of limitations for the federal Wiretapping Act, 18 U.S.C. § 2510 *et seq.*

is "two years after the date upon which the claimant first had a reasonable opportunity to

discover the violation."  18 U.S.C. § 2520(e).  The statute of limitations under the

Tennessee Wiretap Act, Tenn. Code Ann. § 39-13-601 *et seq.,* is also two years.  Tenn.

Code Ann. § 39-13-601(d) ("A civil action under this section …  may not be commenced

later than two (2) years after the date upon which the claimant first discovered or had a

reasonable opportunity to discover the violation.")

Plaintiff wrote defendant an email on August 27, 2007 that he believed defendant

had been "trolling around" in his email after defendant confronted plaintiff about having

dinner with R.G. in Mississippi.  If the limitations period began to run from this date,

plaintiff's claim would be within the two year limitations period.  Prior to that, however,

defendant had indicated to plaintiff that she had read emails of some KLC employees.

She did not, however, reveal that she had done so using spyware; rather, plaintiff thought

she had discovered the necessary passwords.  Unless a person was a particularly

sophisticated computer user, which plaintiff was not, there was no reason to suspect

spyware at this point in time. The Court concludes plaintiff did not have a reasonable opportunity to discover eBlaster on the Dell and Vista computers until Monday, October 27, 2007, when he returned to work from rehabilitation and Andrea Hill gave him the email from the printer in her office bearing the eBlaster/Spectorsoft nomenclature. The Court notes, however, that even after this event, it took a specially retained forensics computer expert to find the eBlaster program on the computers; the KLC IT employee could not find it. Since plaintiff filed this action on June 6, 2009, this action is not barred by the applicable limitations period.

   *B. The Wiretap*

   Plaintiff brings his claims under the Wiretap Act, 18 U.S.C. §§ 2511(1)(a) and (c) and under 18 U.S.C. § 2520. Section 2520 creates a private right of action for damages for those persons "whose wire, oral, or electronic communications have been intercepted, disclosed or intentionally used" in violation of Section 2511.[8] Section 2511(1)(a) and (c) provide in relevant part:

   (1) Except as otherwise specifically provided in this chapter any person
   who—

   _____

   [8]18 U.S.C. § 2520(a) states in relevant part: "... any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate." Tenn. Code Ann. § 39-13-603 is Tennessee's counterpart to Section 2520. It states in relevant part: "any aggrieved person whose wire, oral or electronic communication is intentionally intercepted, disclosed, or used in violation of § 39-13-601... may in a civil action recover from the person or entity that engaged in that violation...."

   32

(a) intentionally ***intercepts***,... any wire, oral, or electronic communication [or];

* * *

(c) intentionally discloses, or endeavors to disclose ... to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the ***interception*** of a wire, oral, or electronic communication in violation of this subsection;

* * *

shall be punished ....

(Emphasis added). [9] Because the Tennessee Wiretap Act (TWA) is, in all respects relevant to this lawsuit, identical to the federal Wiretap Act and there is a dearth of Tennessee law interpreting the TWA, courts have relied upon interpretations of the federal Wiretap Act in order to interpret the TWA. *Cardinal Health 414, Inc. v. Adams*, 582 F. Supp.2d 967, 979 (M.D. Tenn. 2008); *Hayes v. Spectorsoft Corp.*, 2009 WL 3713284 * 9 (E.D. Tenn. Nov. 3, 2009). This Court shall do the same.

On January 26, 2011, the Court entered an order granting in part and denying in part the defendant's motion for summary judgment. In her motion, defendant argued that the spyware she used did not "intercept" electronic communications in transit and, therefore, did not violate either the federal or Tennessee wiretap acts. Adopting the

---

[9] Tenn. Code Ann. §§ 39-13-601(a)(1)(A) and (a)(1)(C) provide in relevant part: a person commits an offense who:
(A) Intentionally intercepts, .... any wire, oral, or electronic communication; [or]

* * *

(C) Intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection (a)....

33

"router switching analysis," the undersigned rejected this argument as it applied to the

email which eBlaster automatically routed from plaintiff's email account to defendant's

email:

> … the Court adopts the router switching analysis relied upon in
> *Szymuszkiewicz* [622 F.3d 701 (7th Cir. 2010)]. Programming a computer,
> either through the use of spyware or legitimate means, to automatically
> forward an e-mail upon receipt by one e-mail account to another e-mail
> account requires that the e-mail be transmitted twice over the internet. First,
> the sender transmits the email, in packets, to the intended recipient through
> the internet. At the intended recipient's computer, the e-mail is
> automatically copied and launched again into the internet, in packets, to be
> transmitted to the third party's e-mail account. That the e-mail may have
> rested momentarily in the intended recipient's account before being
> transmitted back though the internet to the third party is of no consequence.
> That the recipient and the third-party might access their respective email
> accounts on the same computer is immaterial. The e-mail has still been
> captured and rerouted within a "blink of an eye" through the internet to
> someone who was not authorized to have it. That is contemporaneous
> enough.

(Jan. 26, 2011 Memorandum and Order, Doc. 55 at p. 10).

Based on the Court's previous analysis, under the router switching analysis, a

wiretap occurs when spyware automatically routes a copy of an email, which is sent

through the internet, back through the internet to a third party's email address when the

intended recipient opens the email for the first time.  Absent one additional comment, the

Court declines to revisit this issue and incorporates the reasoning of that earlier decision

herein.  Whether the email is rerouted within a "blink-of-an-eye" is not of primary

importance to the router switching analysis.  If it were, a smart programmer could simply

program the software to wait a certain amount of time before rerouting the email through

the internet to the unauthorized third party.  The point is that a program has been installed

34

on the computer which will cause emails sent at some time in the future through the internet to be rerouted automatically through the internet to a third party address when the intended recipient opens the email for the first time.

There was ample evidence presented at trial, (*see, e.g.,* Jt. Ex. 1, PLA 174 – PLA 177), that defendant via eBlaster intentionally and automatically intercepted emails sent to plaintiff through the internet and forwarded copies to herself through the internet at cmgoan@yahoo.com when plaintiff opened those emails for the first time from the Dell or Vista computer. Accordingly, the Court concludes defendant violated the federal and Tennessee wiretap acts.

### C. Consent

It is not a violation of the federal Wiretap Act or the Tennessee Wiretap Act for a person to intercept an electronic communication where one of the parties to the communication has given prior consent. *See* 18 U.S.C. § 2511(2)(d) and Tenn. Code Ann. § 39-13-61(a)(5), respectively.

Defendant testified she had consent to put eBlaster on the computer because plaintiff agreed that they needed to put spyware on the computer to prevent his son from looking at pornography. She also testified she had consent to put eBlaster on the computer because plaintiff was concerned that valuable business secrets were being passed on to a competitor by a KLC employee.

The Court does not find it persuasive that defendant had plaintiff's consent to put spyware on the two computers he used in order to monitor his son or to prevent the leak of

35

trade secrets to a KLC competitor.  There was no credible evidence presented at trial that

Roy's son ever accessed pornography on the KLC computers (or any computer for that

matter).[10]  At the time Crystal put eBlaster on the Dell computer, Roy's children were

visiting only very occasionally.  Moreover, the eBlaster program Crystal bought did not

have parental controls, *i.e.* controls designed to block access to certain types of sites.  The

eBlaster program she bought only recorded what sites had already been accessed.  Two of

defendant's friends testified at trial that, over dinner with plaintiff and defendant, plaintiff

discussed with them his concern about monitoring his son's activity on the internet.  One

of these conversations took place in July 2005, and the other conversation took place in

late 2006.  Neither witness recalled discussing eBlaster, however.  Discussions regarding

monitoring children's internet activities may very well have been held.  Any responsible

parent of a school age child who uses a computer will be concerned about limiting access

to undesirable websites.  Such a concern does not, however, *per se* translate into a

decision to buy spyware, especially spyware which has no parental controls on it such as

the eBlaster programs defendant bought and installed on the Dell and Vista computers.

The single most persuasive piece of evidence presented at trial that Roy did not

consent to placing eBlaster on the Dell and Vista computers is evidence provided by the

---

[10] Roy admitted to accessing pornography on the KLC computers – using his password
which he did not share with his son.  This testimony is supported by the fact that Roy's
password is shown on the eBlaster  reports showing the porn sites which were accessed.
Further, Roy's son was not in Greeneville on at least one occasion when such sites were
recorded by eBlaster.

defendant: the two taped conversations of early November 2007 between defendant and plaintiff in which plaintiff told defendant that some KLC employees believed she had put eBlaster on KLC computers. Defendant feigned complete ignorance of eBlaster and acted as if she were furious to be accused of such behavior. Had spyware been something they both had agreed upon in order to monitor his son's or KLC employees' activities, then she would have reminded him of that. In this same vein, plaintiff was forced to hire a forensics expert to find eBlaster on the computers because defendant would not admit she had placed eBlaster on the computers even though defendant knew KLC wanted to know if eBlaster was on any of its computers. Moreover, the forensic computer evidence indicates defendant altered the September 27, 2007 agreed order and used eBlaster to alter certain emails to gain an advantage in the divorce. Defendant also testified in a deposition in the divorce proceedings that she put the spyware on the Vista computer because she believed Roy was having an affair. Such conduct is consistent with a secretive effort to intercept plaintiff's communications, not with a mutually agreed upon effort to monitor the conduct of defendant's children for their welfare.

Finally, Crystal also argues that Roy gave her the administrative password to the Dell and Vista computers and thereby gave his permission *de facto* to install eBlaster on those computers. Plaintiff denies he gave her the administrative password. Andrea Hill's testimony was that the computers in the KLC office, including her administrative computer, were often left on overnight. Therefore, defendant would not have needed an administrative password for the Dell and Vista computers to install eBlaster on them. The

37

Court does not credit defendant's testimony.  Furthermore, even if plaintiff had given defendant the administrative password for the Dell and Vista computers only, the Court still rejects defendant's argument.  Plaintiff did not give defendant his password for his AOL email account – this she discovered through the keylogging mechanism on eBlaster.  If she had had his consent to intercept his emails and forward them to her Yahoo account, he would have given her his email password.  The Court concludes defendant lacked consent to install eBlaster on the Dell and Vista computers in order to intercept plaintiff's email.

### D. Accord and Satisfaction

Defendant contends plaintiff's claims are barred by the affirmative defense of accord and satisfaction.  According to defendant, as part of their divorce settlement, plaintiff agreed to waive his wiretapping claims in exchange for defendant's receiving a smaller monetary settlement.

On February 9, 2008,  plaintiff sent defendant a text message stating, "at any rate when it comes to your settlement offer, u [sic] should take into consideration that I know all about your eblaster on [sic]…"  Jt. Ex. 1. , PLA 125.  On March 26, 2008, the parties engaged in an unsuccessful, court-ordered mediation.  In January 2009, the parties engaged in a second court ordered mediation which did result in a settlement of the divorce action.

Defendant testified at trial that the parties discussed plaintiff's putative wiretapping claims during the two mediation sessions for their divorce case and that she

38

agreed to take a lesser monetary settlement in exchange for his waiving any wiretapping

claims. Plaintiff vehemently denies he agreed to waive his wiretapping claims. Rather,

plaintiff testified he explicitly told his lawyer and the mediator he would not settle his

wiretapping claims because he fully intended to pursue them. It does not appear that

plaintiff and defendant were together during discussions of the settlement of their divorce.

Other than the settlement agreement itself, the parties' testimony is the only evidence the

Court has regarding what was discussed during the mediation. The Court does not credit

the defendant's testimony.

> The applicable language contained in the marital dissolution agreement provides:

> "Husband and wife expressly certify and acknowledge that they have entered into
> this Agreement upon mature consideration, that they have each fully disclosed all
> of their assets, and that all of said assets have been distributed herein. Consent to
> the execution of this Agreement has not been obtained by duress, fraud or undue
> influence by any person but the parties acknowledge and represent that they have
> voluntarily, knowingly and willingly entered into this Agreement."

> The elements and the governing principles of the law regarding accord and

satisfaction are well established under Tennessee law:

> An accord is an agreement whereby one of the parties undertakes to give or
> perform, and the other to accept in satisfaction of a claim, liquidated or in dispute,
> and arising either from contract or from tort, something other than or different
> from what he is or considers himself entitled to; and a satisfaction is the execution
> of such agreement. **To constitute a valid accord and satisfaction it is also
> essential that what is given or agreed to be performed shall be offered as a
> satisfaction and extinction of the original demand; that the debtor shall intend
> it as a satisfaction of such obligation, and that such intention shall be made
> known to the creditor in some unmistakable manner.** It is equally essential that
> the creditor shall have accepted it with the intention that it should operate as a
> satisfaction. Both the giving and the acceptance in satisfaction are essential
> elements, and if they be lacking there can be no **accord and satisfaction.** The

intention of the parties, which is of course controlling, must be determined from all the circumstances attending the transaction.

*Belcher v. Belcher*, 2005 WL 2333607 *2 (Tenn. Ct. App. Sept. 23, 2005) (unpublished and emphasis added) (quoting *Lytle v. Clopton,* 149 Tenn. 655, 261 S.W. 664, 667-68 (Tenn. 1924) (quoting 1 C.J. *Accord and Satisfaction,* §§ 1 and 16 (1914)); *see also, Quality Care Nursing Servs., Inc. v. C.B. Coleman,* 728 S.W.2d 1, 5 (Tenn.1987).

Defendant bears the burden to prove by a preponderance of the evidence that the parties agreed during their second mediation to include the wiretapping claims as part of the settlement agreement. *Quality Care Nursing Servs.,* 728 S.W.2d 1 at 5 (The party asserting the defense of accord and satisfaction bears the burden of proving it.) The evidence must indicate that such intention was made known to the plaintiff "in some unmistakable manner." The text message plaintiff sent to defendant approximately one year before the second mediation is not sufficient evidence to establish that the parties discussed during their second mediation and intended to include in their settlement agreement the wiretapping claims. Further, the relevant language in the settlement agreement makes no reference to such claims, an omission the Court finds significant. Had the parties discussed these claims and intended to include them in the agreement, then it is likely some specific reference would have been made to them. There is no such reference. Further, the Court does not credit the defendant's testimony. Accordingly, the Court concludes defendant has failed to meet her burden of proof on this affirmative defense.

40

*E. Damages*

A person whose electronic communication has been intercepted in violation of the federal and Tennessee wiretap acts may obtain damages including punitive damages, and reasonable attorney's fees and costs.  18 U.S.C. § 2520(b) and Tenn. Code Ann. § 39-13-603(a).

*1. Statutory Damages*

Under both the federal Wiretap Act and Tennessee Wiretap Act, the plaintiff may recover the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000.  *See* 18 U.S.C. § 2520(c)(2)(A)-(B) and Tenn. Code Ann. § 39-13-603(a)(1)(A)-(B).  Plaintiff asks for the statutory, liquidated damages of $10,000 for each instance in which defendant installed eBlaster on one of the KLC computers.

In *Smoot v. United Transportation Union*, 246 F.3d 633, 644-46 (6th Cir. 2001), the Sixth Circuit held "that a claimant may be awarded more than $10,000 in damages under § 2520(c)(2)(B) only if violations of the Act occurred on more than one hundred separate days…."  This "one hundred separate days" limitation on the $10,000 statutory award applies regardless of the *type* of wiretap violation.  For example, 20 days in which electronic communications were *intercepted* in violation of the federal Wiretap Act and 10 days in which intercepted electronic communications were *disclosed* in violation of the

41

federal Wiretap Act would still entitle the wronged individual to only $10,000 in liquidated damages. The rationale for this holding is that

> [t]he $10,000 liquidated damages amount under § 2520(c)(2)(B) is designed to compensate a claimant for all of a transgressor's misdeeds under the Act, unless that transgressor has violated the Act on more than one hundred separate days, in which case compensation is $100 for each such day.

*Id.* at 646. Given this "single sum" approach per 100 days of violations, the Court concludes it is irrelevant that defendant installed eBlaster twice, once on two different computers. Defendant was still intercepting the same person's email, and plaintiff has not proven that plaintiff's emails were intercepted on more than 100 days. Thus, the Court concludes that plaintiff is entitled to the liquidated damages sum of $10,000 only once. The Court further concludes that even if the Court has discretion to award a lesser amount of liquidated damages, the $10,000 amount is appropriate and proper in this case.[11]

### *2. Punitive Damages*

The standard to award punitive damages under the federal Wiretap Act, 18 U.S.C. § 2520(b), and the Tennessee Wiretap Act, Tenn. Code Ann. § 39–13–603(a), were set forth in detail by the Court in its November 4, 2011 decision, pages 2-3, denying the

---

[11] There is a complete dearth of Tennessee case law addressing this particular issue, *i.e.*, how often the $10,000 liquidated damages penalty can be applied. Thus the Court relies on the case law interpreting the federal Wiretap Act to interpret the Tennessee Wiretap Act.

defendant's motion for summary judgment on the issue of punitive damages [Doc. 88].

That portion of said decision is incorporated herein by reference.

Were the Court required to rely primarily on the testimony of either party, it would be very difficult to reach a conclusion about the plaintiff's conduct. Defendant's testimony, in particular, is so contradictory to the forensic and documentary evidence and so inconsistent with her previous statements as to render her testimony at trial completely incredible. However, there is clear and convincing evidence from sources other than the two parties' own testimony that defendant engaged in egregious conduct: evidence from William Dean's forensic computer examination of the KLC computers and defendant's laptop computer; from the documentary evidence, much of which was produced by defendant pursuant to a subpoena; from the two recorded phone conversations (again produced by the defendant); and from other witnesses.[12] The Court has detailed this evidence in the fact portion of this opinion. All this evidence considered as a whole leads to only one logical conclusion: defendant engaged in a concerted scheme to gain advantage over the plaintiff in a divorce by 1) tricking plaintiff into signing an altered prenuptial agreement with a provision that rendered the prenuptial agreement null and void in the event that plaintiff committed adultery, 2) by secretly substituting a page in the September 27, 2007 Agreed Order with different pages that contained a provision making

---

[12] By the time discovery in the divorce proceedings began, defendant was well aware plaintiff knew about eBlaster and had hired a forensic computer expert to examine the KLC computers and her computer. Defendant also knew that plaintiff knew the November 6 and 8, 2007 phone conversations had been recorded.

43

plaintiff's premarital assets part of the marital assets and forfeiting three fourths of those assets to defendant if plaintiff committed adultery, 3) by secretly installing eBlaster on the computers regularly used by plaintiff, 4) by secretly intercepting at least three emails sent by R.G. to plaintiff and altering them to look like R.G. and plaintiff were having an affair, and 5) by intending to use the altered emails, the altered prenuptial agreement and the altered September 27, 2007 agreed order to obtain a significant amount of plaintiff's property to which she was not entitled in a divorce from plaintiff. The Court concludes the only reason this plan was not successful was that defendant was unable to keep eBlaster a secret. Once eBlaster was discovered, plaintiff launched into an investigation which uncovered defendant's conduct. This conduct on the part of the defendant was extreme and outrageous and merits punitive damages.

The Court may also consider the conduct of plaintiff in determining punitive damages. Plaintiff frequently abused alcohol during the marriage which caused him to be verbally and physically abusive. Further, during the course of their divorce proceedings and after their divorce proceedings, plaintiff engaged in behavior which can only be described as harassment of the defendant. He sent defendant incendiary text messages and popped up in places around town where defendant could be found. His conduct included "shooting the bird" at defendant and making prejorative comments about her in public settings. Plaintiff's conduct bordered on stalking. "[T]wo wrongs do not make a right. Two wrongs simply make two wrongs." *Minnick v. California Dept. of Corrections,* 452 U.S. 105, 128 (1981) (Rehnquist, J., concurring). Finally, the amount of punitive damages

44

should bear a reasonable relation to actual damages awarded. *BMW of N.A. v. Gore,* 517 U.S. 559, 580 (1996); *Argentine v. United Steelworkers of America, AFL-CIO*, 287 F.3d 476, 488 (6th Cir. 2002). Considering the totality of the circumstances discussed herein, the Court awards plaintiff $10,000 in punitive damages.

### *3. Reasonable Attorney's Fees and Expenses*

Pursuant to 18 U.S.C. § 2520(b)(3) and Tenn. Code Ann. § 39-13-603(a)(3), the Court is authorized to award reasonable attorney's fees and expenses, and, in this case, the Court finds such an award is appropriate. Within sixty (60) days of entry of judgment in this action, plaintiff shall submit to the Court a detailed statement of attorney's fees and expenses. Plaintiff's application should consider the factors listed in Rule 1.5 of the Tennessee Rules of Professional Conduct and be supported by appropriate invoices and affidavits. Thereafter, defendant shall have twenty (20) days in which to respond to plaintiff's application.

## IV. Conclusion

The Court concludes plaintiff has proven at trial by a preponderance of the evidence that defendant violated the federal and Tennessee wiretap acts by intercepting plaintiff's emails. The Court therefore shall award the plaintiff $10,000 in statutory damages. Further, the Court concludes that plaintiff has proven by clear and convincing evidence that defendant engaged in outrageous and egregious conduct and the Court awards plaintiff $10,000 in punitive damages. Finally, the Court determines that plaintiff

45

is entitled to reasonable attorney's fees and costs to maintain this action.  An appropriate

judgment shall be entered.

s/ **William B .Mitchell Carter**
_____
William B. Mitchell Carter
United States Magistrate Judge